[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} This is an appeal by defendant, Fentahun G. Mengistu, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of one count of aggravated robbery and one count of receiving stolen property.
 {¶ 2} On February 13, 2001, defendant was indicted on one count of aggravated robbery, in violation of R.C. 2911.01, two counts of robbery, in violation of R.C. 2911.02, one count of kidnapping, in violation of R.C. 2905.01, and one count of receiving stolen property, in violation of R.C. 2913.51. Defendant's case initially came for trial before a jury on November 27, 2001, but the trial court declared a mistrial and excused the jury.
 {¶ 3} Defendant was retried on December 10, 2001, and the following facts were developed at that trial. On the evening of November 5, 2000, at approximately 9:00 p.m., Visouth Thanthanavong went to a neighborhood CVS Pharmacy, located at the intersection of East Main Street and Hamilton Avenue, to obtain a prescription. He drove to the pharmacy in a white 1998 Honda Passport, owned by his mother.
 {¶ 4} As Thanthanavong was leaving the pharmacy, he noticed two young men sitting near a bus stop. Thanthanavong was carrying his keys in one hand, and one of the men walked toward him and asked him for the time. At trial, Thanthanavong identified defendant as the individual who approached him the night of the incident. Thanthanavong looked the young man in the eye and said he did not know the time.
 {¶ 5} The youth told him to "step the fuck back from the car." (Tr. Dec. 10, 2001, at 42.) Thanthanavong proceeded to enter his vehicle when he heard "metal scratching on metal." Id. The youth again told him to "step the fuck back from the car." Id. Thanthanavong looked up and observed the man pointing a gun at him. The assailant told him once more to step away from the car and to drop his keys on the ground. Thanthanavong dropped his keys and the youth then told him to walk toward an alley across from the parking lot. As he began walking toward the alley, Thanthanavong heard the sound of his car engine starting. Near the alley, the youth asked Thanthanavong if he had any cash, and when Thanthanavong said no, the individual requested his I.D., ordering him to throw his wallet on the ground. The youth then got in the passenger side of the car, and the car left the parking lot.
 {¶ 6} Thanthanavong ran into the pharmacy and a store employee telephoned the police. Thanthanavong gave the police a description of his assailant, including information that the youth was wearing a pullover jacket and a pair of black jeans. Later during the investigation, police officers showed Thanthanavong a set of photographs and he selected a photograph of defendant from the array.
 {¶ 7} On November 7, 2000, two days after the incident at the CVS pharmacy, Sandra Thanthanavong, the wife of Visouth Thanthanavong, drove to Walnut Ridge High School to pick up her niece from school. Upon arriving at the school, she observed her mother-in-law's Honda Passport with three individuals inside the vehicle. At trial, Thanthanavong testified that defendant was seated in the front passenger seat.
 {¶ 8} Columbus Police Officer Ronald Howell was on duty at the school that day, and Thanthanavong approached the officer and told him what had occurred, providing him with a description of the vehicle. Officer Howell recalled seeing the Honda earlier that day with four individuals inside, and he relayed a dispatch on the police radio regarding a possible stolen vehicle. The officer then went to the parking lot where he observed the vehicle and a lone individual inside, seated in the driver's seat. Police officers removed the individual from the vehicle and placed him under arrest. At trial, Howell identified defendant as the person discovered in the car on that date.
 {¶ 9} Defendant's mother, Alem Merisha, testified on behalf of defendant. Merisha and defendant reside at 4949 Andrew Court in Columbus, Ohio. According to Merisha, on November 5, 2000, defendant arrived home between 7:30 and 8:00 p.m., and remained in the house the rest of that evening.
 {¶ 10} Defendant, age 18, testified on his own behalf, and gave the following account regarding the events at issue. On Sunday, November 5, 2000, defendant spent the morning at a friend's house "in the area by the CVS." (Tr. Dec. 11, 2001, at 69.) The CVS is located approximately one to one and a half miles from his house. Defendant had not been home on Friday or Saturday, so he went home Sunday evening at approximately 7:00 p.m., because his mother "was already mad." Id. Defendant testified that he did not leave his house that evening.
 {¶ 11} According to defendant, his friend "Tatazu" obtained the Honda Passport, and defendant acknowledged riding in the vehicle on the following Tuesday. Specifically, on Tuesday morning, some friends came over to his house, and they later went to another friend's house. At approximately 2:00 p.m., defendant and his friends took the vehicle to Walnut Ridge High School, where he is a student. They arrived late to school because "[w]e wanted to get there like when the bell rang." Id. at 71. Defendant denied driving the vehicle that day. He stated that Tatazu drove the vehicle to school while he sat on the passenger side. Defendant acknowledged that he was sitting in the driver's seat of the vehicle when police officers approached the vehicle at the school. Defendant explained that, when they arrived at school, everybody got out of the vehicle, but he "didn't go to school that day. So, you know, if any teacher saw me, I was going to get in trouble with school." Id. at 74. Defendant asked his friend for the keys "so I could sit in the car and listen to music. So, he threw the keys at me and I got in the driver's side." Id.
 {¶ 12} Defendant was arrested and released the following day. Approximately one week later, police officers attempted to contact defendant but he was not at home. Eventually, defendant spoke with police officers at his house. Defendant stated he was "hard-headed," and he "didn't want to tell on my friends, so I made up a story. I told them something like I was at Hamilton Arms and somebody came over and asked for something. I just got in the car with them and went to the store." Id. at 77. Later, defendant "started telling them like what really happened after I got out of jail." Id. at 78.
 {¶ 13} Following the presentation of evidence, the jury returned verdicts finding defendant guilty of aggravated robbery, robbery, kidnapping and receiving stolen property. By corrected judgment entry filed April 16, 2002, the trial court sentenced defendant to three years incarceration on count one (aggravated robbery) and six months on count five (receiving stolen property), with the sentences to run concurrently. The court did not impose sentences on the robbery counts, and the court merged the kidnapping count with the aggravated robbery count.
 {¶ 14} On appeal, defendant sets forth the following three assignments of error for review:
 {¶ 15} "I. The trial court's decision to grant the prosecutor's motion for a mistrial was an abuse of discretion, and the retrial violated the double jeopardy clause of the Fifth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.
 {¶ 16} "II. By declaring a mistrial during exculpatory defense testimony, the trial court deprived appellant of his right to present a complete defense as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.
 {¶ 17} "III. The repeated failures of appellant's trial counsel to make objections, raise crucial issues, and preserve an adequate record, and engage in basic advocacy constituted ineffective assistance of counsel, thereby depriving appellant of his rights as guaranteed by theSixth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution."
 {¶ 18} Defendant's first and second assignments of error are interrelated and will be discussed together. Under his first assignment of error, defendant contends the trial court's decision to grant the prosecutor's motion for a mistrial was an abuse of discretion, and that defendant's subsequent retrial should have been barred on double jeopardy grounds. Under his second assignment of error, defendant asserts the trial court's declaration of a mistrial deprived him of the opportunity to present exculpatory testimony.
 {¶ 19} At the outset, we note the following background facts regarding the first trial of this matter. During that trial, defendant called an acquaintance, Cedric King, as a witness. On direct examination by defense counsel, King stated that he was at the CVS pharmacy on the night of the events at issue with a friend named "Tatazu." King testified that they were sitting at a bus stop when they observed a Honda Passport and Tatazu decided to "take the car." (Tr. Nov. 28, 2001, at 116.) According to King, Tatazu "got the guy out of the car with a gun and told him to walk this way and took the car." Id.
 {¶ 20} While King was on the witness stand, the trial judge told counsel to approach the bench. Out of the presence of the jury, the judge expressed concern that the witness was incriminating himself, and that he needed to consult with an attorney. The prosecutor agreed with the judge that, if the witness "is going to confess * * * on the stand, he is opening himself up to aggravated robbery." Id. at 118. The trial judge then questioned the witness outside the presence of the jury, informing King that his testimony could result in charges brought against him for aggravated robbery and robbery. King was then given the opportunity to consult with an attorney and, based upon advice of that counsel, King stated he did not wish to answer any further questions.
 {¶ 21} At that time, the prosecutor requested a mistrial, based upon the state's inability to cross-examine the witness regarding the testimony already provided. The prosecutor also argued that a mistrial was warranted because of a comment made by defense counsel during opening statement, in which counsel represented that defendant had offered to take a polygraph examination. In response, defense counsel stated, "I concur with the prosecution that I committed that egregious error the other day, which I apologized to the court. Coupled with this situation which has arisen, I have no objection to the court declaring a mistrial at this time and rescheduling this for a hearing at a later date." Id. at 123. The trial judge then declared a mistrial and excused the jury.
 {¶ 22} On appeal, defendant argues the trial court abused its discretion in granting a mistrial because no "manifest necessity" was demonstrated. Defendant further contends the record fails to indicate any efforts by the trial court to find a less drastic alternative to a mistrial.
 {¶ 23} In general, trial courts enjoy broad discretion in ruling on motions for mistrial. State v. McCain, Pickaway App. No. 01CA22, 2002-Ohio-5342. In the absence of an abuse of discretion, a reviewing court will not disturb a trial court's decision regarding a motion for mistrial. Id.
 {¶ 24} The Fifth Amendment to the United States Constitution guarantees that no person shall be put in jeopardy twice for the same offense, and this federal protection is applicable to the states through the Fourteenth Amendment. Broadview Hts. v. Baron (2000),139 Ohio App.3d 729. Under double jeopardy principles, "the issue of whether subsequent prosecution can be had after a mistrial has been declared is dependent on two things: first, whether jeopardy has attached and, second, whether, if jeopardy has attached, a retrial is barred by the Constitution or falls within an exception." Cleveland v. Wade (Aug. 10, 2000), Cuyahoga App. No. 76652. It is well-established that jeopardy attaches in a jury trial once a jury is impaneled and sworn, regardless of whether or not any evidence was presented. State v. Nottingham (Mar. 14, 1985), Greene App. No. 84-CA-67.
 {¶ 25} For purposes of the instant appeal, there is no debate that in the first trial of this matter jeopardy had attached, as a jury was impaneled and sworn; thus, the critical issue is whether an exception to the prohibition to double jeopardy is applicable.
 {¶ 26} In a case in which a mistrial has been declared "without the defendant's request or consent, double jeopardy will not bar a retrial if (1) there was a manifest necessity or a high degree of necessity for ordering a mistrial; or (2) the ends of public justice would otherwise be defeated." Wade, supra. However, "[t]he protection embodied in the Double Jeopardy Clause is a personal defense that may be waived or foreclosed by a defendant's voluntary actions or choices, including a request for or effectual consent to a mistrial." United States v. Aguilar-Aranceta (C.A.1, 1992), 957 F.2d 18, 21. In the context of a retrial following the declaration of a mistrial, the key consideration for double jeopardy purposes is whether the mistrial was declared with defendant's consent. Id. at 21-22, citing United States v. Dinitz (1976), 424 U.S. 600, 608, 96 S.Ct. 1075. If the mistrial was declared with defendant's consent, he is deemed to have waived any double jeopardy claim he might otherwise have; if, however, defendant wishes to proceed to a verdict by the jury impaneled, and the trial court declares a mistrial over his objection, the double jeopardy clause will bar defendant's retrial unless manifest necessity required the court to so act. Aguilar-Aranceta, supra, at 22. Further, "[t]he only circumstance in which the defendant's consent to a mistrial does not operate as a waiver of * * * [a defendant's] right to claim double jeopardy is where the prosecutor or the judge intentionally provokes the defendant to request the mistrial." Id.
 {¶ 27} In the present case, while it was the prosecutor who made the request for a mistrial, based upon his inability to cross-examine the witness (and defense counsel's remarks regarding a polygraph), the record clearly indicates that defense counsel consented to discontinuing the trial. As noted above, defense counsel acknowledged that he had erroneously made a comment during opening statement about defendant's offer to take a polygraph, and counsel stated that, "[c]oupled with this situation which has arisen, I have no objection to the court declaring a mistrial at this time and rescheduling this for a hearing at a later date." The United States Supreme Court has held that " '[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed.' " United States v. DiPietro (C.A.1, 1991), 936 F.2d 6, 11-12, quoting Dinitz, supra, at 609. Here, the record indicates that defense counsel not only acquiesced in the decision to grant a mistrial, but counsel expressly consented to the scheduling of a new trial. Under these circumstances, where defendant retained control over the course to be followed, we conclude that his retrial was not barred by double jeopardy. DiPietro, supra, at 12.
 {¶ 28} As noted previously, defendant contends there was no "manifest necessity" for a mistrial, and that the trial court failed to find a less drastic alternative to a mistrial. However, because the record shows that the mistrial was not declared without defendant's consent, the presence or absence of manifest necessity is not a consideration. See Oregon v. Kennedy (1982), 456 U.S. 667, 672,102 S.Ct. 2083; United States v. Mitchell (C.A.9, 1984), 736 F.2d 1299, 1300
("Where defendant consents to a mistrial * * * the `manifest necessity' doctrine does not come into play and as a general rule retrial is permitted because defendant himself has elected to terminate the proceedings and begin afresh"); DiPietro, supra, at 9 (manifest necessity test does not apply when defendant has effectually consented to the mistrial). In the instant case, where defense counsel failed to express any interest in obtaining a verdict from the first jury, nor did counsel offer any alternatives which defendant now argues the court could have employed, we are unable to conclude that the trial court erred in its decision to grant a mistrial. Further, in light of defense counsel's consent to the discontinuance of the trial, we find no merit to defendant's claim that he was denied the right to have exculpatory evidence presented at that first trial.
 {¶ 29} Based upon the foregoing, we find that double jeopardy did not bar retrial of defendant under the facts of this case, and defendant's first and second assignments of error are overruled.
 {¶ 30} Under his third assignment of error, defendant asserts that he was denied effective assistance of trial counsel. Specifically, defendant points to the following four purported instances in which his trial counsel was deficient: (1) failing to object to the prosecutor's motion to declare a mistrial, and then failing to move to dismiss the indictment on double jeopardy grounds after the first trial; (2) failing to file a pretrial motion to suppress the out-of-court identification; (3) making no effort to present the jury at the second trial with the substance of Cedric King's testimony; and (4) demonstrating a general lack of effective knowledge of the criminal advocacy process.
 {¶ 31} In State v. McKinley, Franklin App. No. 02AP-371, 2002-Ohio-7191, this court discussed the standard for ineffective assistance of counsel as follows:
 {¶ 32} "The well-established standard by which we are bound in reviewing a claim of ineffective assistance of counsel is set forth in Strickland v. Washington (1984), 466 U.S. 668; accord State v. Bradley (1989), 42 Ohio St.3d 136 * * *. In order to prevail on a claim of ineffective assistance of counsel, appellant must satisfy a stringent two-part test. First, appellant must demonstrate that counsel's performance was deficient. To meet that requirement, appellant must show that counsel's purported error was such that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment to the United States Constitution. Appellant may prove that counsel's conduct was `deficient' by identifying acts and/or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all of the circumstances, the alleged acts and/or omissions were outside the wide range of professionally `competent' assistance. Strickland, supra at 690.
 {¶ 33} "If appellant successfully proves that counsel's assistance was `deficient,' the second prong of the Strickland test requires appellant to demonstrate resulting prejudice. To satisfy that requirement, appellant must show that counsel's errors were so deficient as to deprive him of a fair trial, a trial with a `reliable' result. Id. at 687, 692. Appellant would meet this standard by showing that `there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id. at 694." (Emphasis sic.)
 {¶ 34} Defendant initially contends that his counsel was ineffective in failing to object to the prosecutor's motion for mistrial, and in subsequently failing to file a pretrial motion to dismiss before the second trial. We will first address counsel's purported deficient performance in failing to object to the prosecutor's motion for mistrial.
 {¶ 35} In the present case, following King's decision to invoke his constitutional right to remain silent during direct examination by defense counsel, the trial court accepted the state's argument that it would be prejudiced by its inability to cross-examine the witness. The state's argument was not unreasonable, inasmuch as the prosecutor would have been unable to cross-examine King on any of his testimony, and the trial court was presumably concerned about the reliability of King's testimony and the state's inability to test the truth of that testimony.[1] See, e.g., Lawson v. Murray (C.A.4, 1988),837 F.2d 653, 655 ("The defendant's right to present witnesses in his own defense * * * does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination"); United States v. Nobles (1975),422 U.S. 225, 241, 95 S.Ct. 2160 ("The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversary system; one cannot invoke the Sixth Amendment as a justification for presenting what may have been a half-truth"). Under such circumstances, a trial court is vested with discretion in deciding whether to allow testimony that cannot be challenged by the opposing party. See United States v. Gary (C.A.1, 1996), 74 F.3d 304, 310 ("When cross-examination on material issues raised on direct examination is curtailed because of a witness's valid claim of privilege * * * the trial court, in its discretion, may refuse to permit that witness's testimony"). Here, defendant has failed to show a reasonable likelihood that an objection to the state's motion for mistrial would have been granted, and thus defendant cannot demonstrate prejudice under the Strickland standard.
 {¶ 36} Regarding defendant's contention that his counsel should have filed a pretrial motion to dismiss prior to the second trial, the record indicates that his trial counsel did request the court dismiss the case on double jeopardy grounds during the second trial. The trial court denied the motion, explaining its reasons on the record as follows:
 {¶ 37} "* * * [T]he court recalls that the witness' testimony had progressed to the point where it would have prejudicially affected the ability of the state of Ohio to represent their client after the witness — that would be Mr. King — had begun his testimony. And then he decided that he would not testify any further because he wished to avail himself of the U.S. Constitution's Fifth Amendment Rights.
 {¶ 38} "This would have made it impossible for the state to cross-examine this witness. And it was on that basis that the mistrial was declared.
 {¶ 39} "I still feel that reason was appropriate and proper and that the declaration of a mistrial was also appropriate. So, that motion is * * * denied." (Tr. Dec. 11, 2001, at 57-58.)
 {¶ 40} Thus, even though defense counsel did not file a pretrial motion to dismiss based on double jeopardy grounds, the issue was addressed and rejected by the trial court during the second trial. Upon review of the record, we agree with the state's contention that there was no greater likelihood a motion to dismiss would have been successful had it been made prior to trial, and thus defendant has not demonstrated prejudice under Strickland.
 {¶ 41} Defendant next contends that his counsel was ineffective in failing to file a pretrial motion to suppress the out-of-court identification of defendant made by the victim, Thanthanavong. We disagree. The failure of defense counsel to file a motion to suppress "is not per se indicative of ineffective assistance of counsel." State v. Stewart (Dec. 15, 1997), Washington App. No. 96CA18.
 {¶ 42} At the outset, we note that defendant does not identify the identification procedure he finds objectionable, nor does the record reflect that an improper identification took place. Thus, counsel's performance cannot be deemed ineffective for failing to seek to exclude admissible evidence.
 {¶ 43} Defendant asserts that, because the victim was the only eyewitness to identify him, a pretrial motion would have permitted a challenge to the reliability of his identification. However, a motion to suppress evidence "is not used to test reliability or weight of the evidence." Id. Thus, in Stewart, supra, the court rejected the defendant's request "to presume that there was a constitutional violation because the facts and circumstances surrounding the lineup were `unexplored.' " Id. The court held that it would "not imply either of the two * * * factors necessary to show ineffective assistance of counsel under the Strickland standard but will require that they be affirmatively shown." Id. Similarly, in the instant case, defendant has made no such affirmative showing. Finally, as noted by the state, the record indicates that trial counsel had the opportunity to cross-examine the witness at trial regarding the photo array, and the victim positively identified defendant as the individual who robbed him. Defendant has not shown that his counsel was ineffective in failing to file a motion to suppress where the record does not support defendant's contention that the motion would have been granted, nor does the record demonstrate that defendant was prejudiced by the failure to file the motion.
 {¶ 44} Defendant next contends that his trial counsel was ineffective in failing to make an effort to present, during the second trial, the substance of King's prior testimony presented at the initial trial. Defendant contends that his trial counsel could have sought to introduce the evidence by means of either Evid.R. 804(B)(1) or 804(B)(3).
 {¶ 45} A review of the record indicates that, during the second trial of this matter, defense counsel expressed his intention to call Cedric King as a witness. Out of the presence of the jury, the trial judge spoke with King's attorney, who stated that he had informed his client that it would be against his best interest to testify. Counsel represented that his client had "agreed to follow my advice." (Tr. Dec. 11, 2001, at 63.) The trial judge then questioned King as to whether it was his wish to avoid making statements that might be incriminating, and King responded affirmatively. Defense counsel then asked King if "this is your final decision * * * [t]hat you are not going to testify on behalf of Mengistu in this case on advice of counsel?" Id. King again responded affirmatively, and defense counsel stated that, "[i]n light of this gentleman saying he is not willing to testify in this case, I would not call him as a witness." Id. at 64.
 {¶ 46} Defendant concedes that it would have been improper for his trial counsel to have called the witness to the stand and permit him to invoke his right to remain silent in front of the jury. As one federal court has noted, "a claim of Fifth Amendment protection is likely to be regarded by the jury as high courtroom drama and a focus of ineradicable interest, when in fact its probative force is weak and it cannot be tested by cross-examination." United States v. Lacouture (C.A.5, 1974),495 F.2d 1237, 1240. Therefore, "[n]either side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him." Id.
 {¶ 47} Regarding defendant's contention that his trial counsel should have sought to admit King's testimony under Evid.R. 804(B)(1), that rule permits the introduction of former testimony which was given under oath and subject to cross-examination by the party against whom the testimony is offered, and states in part:
 {¶ 48} "Testimony given as a witness at another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. * * *"
 {¶ 49} As noted, the record demonstrates that the defense witness provided testimony that was not subject to cross-examination at the first trial. Thus, because the prosecutor did not have an opportunity for cross-examination, the prior testimony was inadmissible under Evid.R. 804(B)(1), and defendant cannot show that his trial counsel's failure to invoke that rule constituted deficient performance or prejudiced him.
 {¶ 50} Defendant also contends that his trial counsel should have sought to introduce King's former testimony pursuant to Evid.R. 804(B)(3).
 {¶ 51} Evid.R. 804(B)(3) allows admission of hearsay of an unavailable declarant when the statement "at the time of its making * * * so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true." Evid.R. 804(B)(3) further provides that "[a] statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
 {¶ 52} For purposes of Evid.R. 804(B)(3) analysis, we will assume the declarant was unavailable (based upon his representation that he would invoke his constitutional right against self-incrimination), and that the statements were adverse to his penal interest (suggesting his involvement in a criminal act with another party). However, the record in this case fails to show corroborating circumstances clearly indicating the trustworthiness of the statements. Specifically, the only corroboration for King's statement, implicating someone named "Tatazu," came from the defendant's own testimony.
 {¶ 53} Courts interpreting Evid.R. 804(B)(3) have generally held that something more reliable than a defendant's self-serving testimony is necessary to meet the rule's corroboration requirement. See, e.g., United States v. Mackin (D.C. Cir. 1977), 561 F.2d 958, 962 (testimony of defendants at trial is not enough to satisfy the requirement of corroboration under Evid.R. 804(B)(3); "there must be additional `corroborating circumstances' "). In United States v. Rodriguez (C.A.2, 1983), 706 F.2d 31, the court held that a statement exculpatory to the defendant was not trustworthy where the only corroboration came from defendant's own statements. In its analysis, the court looked to the Notes of Advisory Committee on Proposed Rules, Evid.R. 804, and cited the House Judiciary Committee's observation that " `simple corroboration was * * * deemed ineffective to accomplish (the purpose of ensuring trustworthiness) since the accused's own testimony might suffice while not necessarily increasing the reliability of the hearsay statement.' " Rodriguez, supra, at 40.
 {¶ 54} We also note that the circumstances under which the statements were made undermine a finding of trustworthiness. Specifically, the evidence indicates that King was a friend of defendant's, and that the statement was not made contemporaneous with the incident; rather, the statement was made during questioning by defendant's counsel at the first trial, and it appears from the record that the first instance in which the state was aware of this information was on the first day of that trial. Thus, the timing of the statement and the declarant's relationship to defendant are factors indicating a lack of trustworthiness. See United States v. Hoyos (C.A.9, 1978),573 F.2d 1111, 1115. It has been held that the underlying concern of Evid.R. 804(B)(3) is that one individual can make statements exculpating another "and then rather easily claim the privilege when the government seeks to cross-examine him to discredit the statement." United States v. Mackey (C.A.1, 1997), 117 F.3d 24, 29. As previously noted, at the initial trial, after King obtained advice from counsel, he changed his mind and invoked his Fifth Amendment privilege not to testify, and he subsequently indicated he would invoke the privilege at the second trial. We further note that, while King made statements potentially implicating himself in the incident, by defendant's own testimony, King "wasn't involved" in taking the car. (Tr. Dec. 11, 2001, at 104.)
 {¶ 55} Because the record fails to demonstrate sufficient corroborating circumstances clearly indicating the trustworthiness of the declarant's statements, defendant cannot show that counsel's failure to seek admission of the statement under Evid.R. 804(B)(3) prejudiced him.
 {¶ 56} Finally, defendant argues his trial counsel made other errors during the course of the two trials, and that the cumulative effect of these errors deprived him of a fair trial. Defendant cites his counsel's remark made during opening statements at the first trial that defendant had offered to take a polygraph test. However, the record indicates that the trial court granted the mistrial based upon the state's inability to cross-examine a defense witness. Further, as noted by the state, the court gave a curative instruction as to the polygraph reference.
 {¶ 57} Defendant next argues that, at the beginning of the second trial, prior to the presentation of evidence, counsel moved to dismiss certain counts in the indictment as being allied offenses of similar import. Defendant contends that his counsel clearly did not understand these motions were not appropriate at that stage of the proceedings. Even assuming, without deciding, that counsel's performance was deficient on this issue, defendant has failed to demonstrate how his counsel's purported misunderstanding of when such a motion should have been made prejudiced him in this case.
 {¶ 58} Defendant also contends his counsel did not make any objections on the record, and engaged in numerous off-the-record discussions at the bench, thereby failing to properly preserve the record for appeal. The record simply does not support defendant's contention that defense counsel failed to make any objections. Rather, a review of the transcript shows that counsel made numerous objections at trial. Further, while defendant makes a general claim regarding off-the-record discussions, he has not specifically alleged how he was prejudiced by any events occurring off-the-record, nor is there a basis upon which this court can determine prejudice.
 {¶ 59} Defendant's final contention is that his trial counsel permitted the prosecutor to cross-examine defendant's mother about defendant's previous incarceration, prompting a curative instruction from the trial court. Defendant maintains that, in the context of a criminal case in which the accused chooses to testify, trial counsel must take all available steps to prevent improper character evidence from tainting the credibility of the defendant.
 {¶ 60} However, as noted by the state, the prosecutor did not ask defendant's mother about a prior incarceration, but rather questioned her about defendant's absences from school. In response, defendant's mother offered that her son had been in jail for three months. Following the mother's testimony, the trial court gave the following curative instruction:
 {¶ 61} "THE COURT: Ladies and gentlemen, before we have our next witness, I want to mention something to you. There has been some testimony presented to you here about the fact that Mr. Mengistu had spent some time in jail, and that there was some other proceedings in another court. That has absolutely nothing to do with what we are doing in this case. It cannot have any affect or any impact on any deliberations that you have in this particular matter.
 {¶ 62} "We are dealing here today with the allegations that are contained in the indictment that will be explained to you at a later time. And whatever happened before this, as far as the court proceedings are concerned, has nothing to do with this trial." (Tr. Dec. 11, 2001, at 40.)
 {¶ 63} The Ohio Supreme Court has held that "[a] jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." State v. Garner (1995), 74 Ohio St.3d 49, 59 (trial court did not err in failing to order a mistrial where reference to defendant's prior arrests was fleeting and was promptly followed by a curative instruction). In the present case, the record indicates the court took prompt measures to ensure the jury did not consider a reference to a prior incarceration, and there is nothing to indicate that the curative instruction, which the jury is presumed to have followed, was insufficient to negate any potential prejudice.
 {¶ 64} Based upon the foregoing, we conclude that defendant has failed to demonstrate that he was denied effective assistance of counsel at trial, and therefore defendant's third assignment of error is overruled.
 {¶ 65} Accordingly, defendant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
PETREE, P.J., and LAZARUS, J., concur.
[1] Federal courts have permitted the exclusion of a defense witness's testimony where that witness has refused on cross-examination to answer questions on non-collateral matters; such exclusion is based upon the principle that, when a defense witness invokes the Fifth Amendment protection against self-incrimination and refuses to answer questions "that go to the heart of the direct testimony on a central issue * * * the truth-seeking function of the court is impaired," and the testimony "cannot be considered reliable." Denham v. Deeds (C.A.9, 1991),954 F.2d 1501, 1504.